IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCHINIECE MORGAN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL ASTRUE, ) <br> COMMISSIONER OF SOCIAL ) <br> SECURITY, ) <br> ) <br> Defendant. ) <br> ) <br> ) | No. 11 C 5989 <br><br> Magistrate Judge <br> Maria Valdez |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Schiniece Morgan's ("Morgan" or "Claimant") claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Morgan's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

## BACKGROUND

### I. PROCEDURAL HISTORY

Morgan originally applied for Disability Insurance Benefits on August 10, 2007, alleging disability since June 27, 2004. (R. 23.) Her application was denied initially on October 17, 2007 and upon reconsideration on February 27, 2008. (*Id.*)

Morgan filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on December 21, 2009. (*Id.*) Morgan personally appeared and testified at the hearing and was represented by counsel. (*Id.*) A vocational expert also testified at the hearing. (*Id.*)

On January 27, 2010, the ALJ denied Morgan's claim for benefits and found her not disabled under the Social Security Act. (R. 31.) The Social Security Administration Appeals Council reviewed the decision. (R. 4-6.) The Appeals Council disagreed with the ALJ's finding that Morgan could perform past relevant work, adopted the ALJ's conclusions with regard to Morgan's credibility, and ultimately found her not disabled. (R. 5.) The Appeals Council's decision is the final decision of the Commissioner and is therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See White v. Sullivan*, 965 F.2d 133, 136 (7th Cir. 1992).

## II. FACTUAL BACKGROUND

### A. Background

Morgan was born on June 13, 1977. (R. 43.) She worked as a cashier in a restaurant in 1994, in telemarketing in 1995, and in a variety of customer and guest service positions between 1996 and 2005, all of which lasted less than one year. (R. 141, 149.) Morgan claims disability due to narcolepsy. (R. 77.)

In her application, Morgan reported that she can perform various household tasks—using kitchen tools, making phone calls, putting on clothes and cleaning herself, carrying bags, vacuuming, doing laundry—but with the risk that she may fall asleep or experience sudden muscle loss in the middle of the task. (R. 189.)

2

Cleaning the house takes an entire day, as she must frequently stop to rest. (R. 190, 193.) She often makes simple, quick meals. (R. 192.) She stopped driving after she had a car accident caused by her falling asleep at the wheel. (R. 190.) She also stopped taking public transportation alone for fear of falling asleep and ending up in the wrong place. (*Id.*) Morgan reported that she cannot sit for long periods of time without falling asleep or having a seizure. (*Id.*) She requires naps after almost any activity, ranging from thirty minutes to three hours. (*Id.*) She rarely goes to church because she is ashamed to fall asleep during services. (R. 191.)

Morgan reported that she and her children live with her mother and father. (R. 192.) Her socializing is limited to friends and family who are aware of her condition. (R. 194.) She relies on her mother and father to help her remember her appointments, pay her bills, manage her finances, and watch the children. (R. 193, 195.) Morgan also claims to have hallucinations and hear voices. (R. 193.)

Janie Morgan, the claimant's mother, completed a third party function report in 2007 and indicated that the claimant could not complete normal household chores, cook a meal, or drive a car, because she constantly fell asleep. (R. 157-59.) Mrs. Morgan clarified that the claimant could make a meal if she was not in a "seizing state," although it would take her twice the normal amount of time. (R. 158.) The claimant could similarly clean, do laundry, or iron, but the tasks would take her two to three times longer than normal and required her mother to constantly wake her up. (R. 159.) Mrs. Morgan also reported that the claimant could pay bills, handle a savings account, use a checkbook, and handle money just as she

3

was able to do prior to the disability. (R. 160.) The claimant attended church and social groups on a weekly basis, although she required reminders. (R. 160-61.) Mrs. Morgan reported that the claimant could only walk for two blocks before needing a short rest and could pay attention for ten minutes at a time. (R. 161.) She had three or four seizures each day, according to her mother's seizure description form. (R. 199.) Her mother reported that the claimant once fell and hit her head during a seizure. (*Id.*)

Two other individuals completed seizure description forms. Morgan's cousin, Mary Roach, indicated that she regularly witnessed the claimant's seizures, which occurred at least two to three times per day. (R. 198.) Morgan's bible counselor reported that he had witnessed at least five of Morgan's seizures in a single week. (R. 200.) He stated that Morgan would lose consciousness for thirty to sixty minutes. (*Id.*)

### B. <u>Testimony and Medical Evidence</u>

#### 1. *Morgan's Testimony*

Morgan testified that she has five children, ranging in age from six to fourteen, and she is not married. (R. 44.) She and her children live with her parents. (R. 47.) She completed two and one half years of college, studying business administration, sales, and marketing, and also earned a certification as a nursing assistant. (R. 44.)

Morgan testified that she was diagnosed with narcolepsy in 2004 and was prescribed medication. (R. 45.) She took the medications—Provigil and Vivactil—for

4

one and a half years and found that they alleviated the bulk of her symptoms, although she still had occasional episodes of cataplexy. (R. 46.) She could stay awake for two to four hours without falling asleep while on medication. (*Id.*) Morgan stopped taking the medications when she became pregnant in 2006. (R. 45.) She has not resumed taking medications, because the Vivactil no longer works and Medicaid no longer covers Xyrem, as it had in the past. (R. 56-57.) When she has a narcoleptic episode, she can be woken up by other people, but during a cataplectic episode she can hear people but cannot move, respond, or be woken up. (R. 60.) She has three or four cataplectic episodes per day. (R. 59.) She also has hallucinations four or five times per week. (R. 61.)

Morgan does not have a driver's license; she had her license revoked in 2005, according to her testimony, after an accident in which she fell asleep at the wheel. (R. 44.) She also avoids public transportation based on the risk that she may fall asleep. (R. 47.) She depends on her parents to drive her and her children, but she does not go out often; she attends church on some Sundays but not all. (R. 47-48.) Morgan can help her children with their homework but sometimes falls asleep. (R. 48, 58.) She stopped cooking after a cataplectic episode at the stove nearly caused her to start a fire in her kitchen. (R. 55, 58.) On "good days" she can do some household chores for up to an hour in the morning, she testified, but then she requires a nap. (R. 55.)

Morgan testified that she is further impaired by a thyroid goiter. She first noticed her goiter in 2004, when it was quite small and unobtrusive, but she did not

5

get diagnosed with a thyroid goiter until 2007. (R. 48.) Eventually the goiter grew large and uncomfortable—inhibiting her breathing and swallowing, causing her to choke and gag, and causing neck pain—and after a biopsy, her doctors recommended that she have it removed. (R. 48-53.)

### 2. *Medical Evidence*

#### a. **Treating Physicians**

Dr. Anas Nahhas saw Morgan in 2003 for a sleep study, known as an overnight polysomnogram, which included a multiple sleep latency test (MSLT). (R. 238, 243.) Dr. Nahhas found that the MSLT results confirmed a diagnosis of narcolepsy with cataplexy. (R. 243.) The sleep study also revealed mild periodic limb movement disorder but otherwise the results were normal. (*Id.*) Dr. Nahhas prescribed Provigil and Vivactil, advised Morgan to take strategic naps, and cautioned her on safe driving. (*Id.*) In a follow up appointment with Dr. Nahhas two months later, Morgan reported that her daytime functioning had improved by 80% but she still woke up repeatedly at night because of leg movements. (R. 244.) She made a return visit to Dr. Nahhas in 2006. (R. 250.) Morgan had stopped taking her medication when she became pregnant, and in 2006 Dr. Nahhas recommended restarting the Provigil and Vivactil and added a prescription for Ambien, noting that Morgan had a history of narcolepsy with cataplexy. (*Id.*) Morgan received the same diagnosis and instructions at a 2007 follow up visit. (R. 260.)

Dr. Lester Hockenberry saw Morgan in 2007 for an office visit, and diagnosed her with both a goiter—discussed below—and "narcolepsy w/o cataplexy." (R. 280.)

6

Several notations on her file with Dr. Hockenberry repeat the diagnosis of "narcolepsy w/o cataplexy." (R. 280, 282, 321, 324.) In his notes from the 2007 visit, however, Dr. Hockenberry wrote that Morgan's "history of present illness" included "frequent episodes of cataplexy." (R. 278, 322.) Dr. Hockenberry also noted that Morgan needed medications for her narcolepsy but the Illinois Department of Public Aid (IDPA) refused to cover them. (R. 280.)

Dr. Metas Morkevicius, a fellow at the Sleep Science Center, saw Morgan in 2009 and diagnosed narcolepsy with cataplexy. (R. 334-35.) Dr. James Herdegen, the attending physician, affirmed the diagnosis of narcolepsy with cataplexy during the same visit. (R. 336.) Dr. Herdegen performed a polysomnogram shortly thereafter and reaffirmed the diagnosis of narcolepsy with cataplexy. (R. 337, 341.)

Dr. Nicholas DiFilippo evaluated Morgan's pulmonary status in 2003 and diagnosed a thyroid problem but did not determine whether she had a sub-sternal goiter. (R. 252.) Dr. Hockenberry performed a thyroid ultrasound in 2007 and diagnosed her with a multinodular goiter. (R. 273.) In 2009, he noted that the goiter had led to deviation of Morgan's esophagus. (R. 320.) Less than two weeks later, Morgan had a total thyroidectomy. (R. 348.)

### b. Non-Treating Physicians

Dr. Vidya Madala completed an initial RFC after reviewing Morgan's records. Dr. Madala found that Morgan could stand for six hours or sit for six hours during a normal eight-hour workday. (R. 294.) Morgan could occasionally climb, kneel, crouch, or crawl; could never balance or stoop, (R. 295); and could be exposed to

7

hazards but had to avoid concentrated exposure, (R. 297). Dr. Madala indicated a diagnosis of narcolepsy with cataplexy, as well as a multinodular goiter. (R. 300.) The RFC was "consistent with safety precaution[s] related to narcolepsy," according to the doctor. (*Id.*)

Dr. Bharati Jhaveri completed a reconsideration of the RFC and, after reviewing the medical evidence, confirmed Dr. Madala's assessment. (R. 301-03.) Dr. Jhaveri noted that the "evidence from treating sources established a history of narcolepsy/cataplexy and hyperthyroidism." (R. 303.) The RFC amounted to medium work activity. (*Id.*)

### 3.    *Vocational Expert's Testimony*

The vocational expert testified that for a person of Morgan's age, education, and work experience, who could perform medium work but could not balance, climb ladders, or be exposed to heights or dangerous machinery, the regional economy holds over 12,000 cashiering jobs, 9,200 food handling positions, 1,200 hand sorters, and 4,200 office helper jobs, as well as telemarketer and hotel clerk positions. (R. 66-67.) If that same person would be off task five percent of the time due to cataplexy, in addition to regularly scheduled breaks, she could still perform the cashier, food handling, hand sorter, and office helper jobs. (R. 67.) If she would be off task twenty percent of the time, however, all of those occupations would be eliminated. (*Id.*)

8

## C. ALJ Decision

The ALJ found that Morgan had not engaged in substantial gainful activity from her initial onset date of June 27, 2004 through her date of last insured of June 30, 2009. (R. 25.) She had worked and earned over $5,000 in 2005, but these jobs lasted less than six months and were therefore unsuccessful work attempts. (*Id.*) The ALJ also found that Morgan had severe impairments of narcolepsy and status post thyroidectomy. (*Id.*) The ALJ found no record evidence to corroborate Morgan's claim that she experienced cataplexy episodes three to four times per day, however, and noted that Morgan had been noncompliant with her medications. (R. 26.) Had she taken her medications, the ALJ stated, Morgan could have fully managed the impairments. (*Id.*) The ALJ concluded that neither of the impairments, alone or in combination, met or medically equaled any listing of impairments. (*Id.*)

The ALJ next determined that Morgan had the RFC to perform medium work with the following additional limitations: never climbing ladders, ropes, or scaffolds; never balancing; occasionally climbing ramps and stairs, stooping, kneeling, crouching, or crawling; and avoiding concentrated exposure to hazards. (R. 26.) The ALJ summarized the medical studies as showing "only mild findings, and claimant's physical examinations are normal for the most part." (R. 30.) She noted that Morgan stayed awake throughout the hearing and did not appear to have concentration problems nor show signs of depression. (*Id.*) The ALJ found no mention of the claimant's allegation that she suffered three to four episodes of cataplexy daily in the treatment records. (*Id.*) The ALJ also gave "some probative

9

weight" to the fact that she found "no treating source opinion" in the evidence. (*Id.*) The state agency medical consultants' opinions that Morgan could do medium work were accorded "substantial weight" in determining the RFC, despite the fact that they were non-examining and non-treating expert sources, as the ALJ noted. (*Id.*)

### D. <u>Appeals Council Decision</u>

The Appeals Council largely adopted the ALJ's findings, including the findings related to whether Morgan was disabled, her subjective complaints, her credibility, and the expert medical opinions. (R. 4-6.) The Appeals Council found that the ALJ was incorrect in determining that Morgan could perform her past relevant work: since it was not substantial gainful activity, the Council reasoned, the claimant had no past relevant work for the purposes of the proceeding. (R. 4, 6.) Otherwise, the Council did not alter the ALJ's decision. The Council found that Morgan had the RFC to perform "a reduced range of the medium exertional level," including positions as a cashier, food handler, hand sorter, and office helper, rendering her not disabled as defined under the Social Security Act. (R. 6.)

## DISCUSSION

### I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is

disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v.*

11

*Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

Morgan argues that the Appeals Council decision was in error for three main reasons: the Council (1) failed to consider evidence of the frequency of Morgan's cataplectic episodes, (2) improperly analyzed Morgan's credibility, and (3) failed to assess the impact of Morgan's obesity.

### A. <u>Frequency of Cataplectic Episodes</u>

Morgan argues that the Appeals Council erred by failing to consider, let alone credit, three different third party reports on the frequency of her cataplexy. The Social Security Administration (SSA) recognizes both treating and non-treating sources as important indicators of the intensity and persistence of symptoms. 20 C.F.R § 404.1529(c)(3). The SSA regulations also note that symptoms may suggest a more severe impairment than can be shown by objective medical evidence. *Id.* The ALJ—whose decision the Appeals Council adopted entirely on this point—found Morgan's allegations of three to four daily episodes of cataplexy "unsupported as they are not mentioned in any treatment notes." (R. 30.) But the ALJ made no mention of where such allegations *were* mentioned: both Morgan's mother and her cousin reported roughly three seizures per day. (R. 198, 199.) Morgan's bible counselor reported a lower frequency of five seizures per week,(R. 200), although this number appeared to reflect the number he had observed, which could explain the discrepancy. The ALJ also failed to make any determination of what the proper frequency was.

13

The methods for diagnosing cataplexy, and the nature of the impairment itself, lend further support to Morgan's position that it was error to ignore the third party reports. Polysomnograms and multiple sleep latency tests (MSLTs) are both used to diagnose cataplexy, and both were used to diagnose Morgan in this case, but they are used to determine the presence of the disorder rather than its frequency. *See, e.g.*, Mayo Clinic staff, *Narcolepsy: Tests and diagnosis*, http://www.mayoclinic.com/health/narcolepsy/DS00345/DSECTION=tests-and-diagnosis (accessed November 28, 2012). The medical records do not indicate any attempt by the treating physicians to determine the frequency of Morgan's cataplectic episodes, nor is it clear whether the exams used to diagnose the impairment can even be used to make such a determination at all. *Cf. id.* The ALJ avoided discussing this conundrum, merely stating that "something as significant as this alleged frequency would certainly have been noted in treatment records." (R. 26.) Why this is "certain" is not clear. After all, the treating physicians prescribed drugs to alleviate Morgan's symptoms and were largely successful, suggesting that the physicians appreciated the severity of Morgan's condition, even if they did not document its frequency. Moreover, as discussed above, they could not have determined the frequency of cataplectic attacks via polysomnogram or MSLT and likely would have been forced to rely on Morgan's own statements regarding frequency in any event. *See* Mayo Clinic staff, *Narcolepsy: Tests and diagnosis* (noting that two of the principle "methods of diagnosing narcolepsy and determining its severity" include sleep history and sleep records, which must be completed by

the patient herself). The non-treating physicians made no findings as to the likely frequency of Morgan's cataplectic episodes, either. Thus the third party reports are uncontroverted in the record, and lay observation appears to be the only way to determine the frequency of cataplectic episodes.

The frequency and intensity of Morgan's cataplexy is central to the RFC determination. As a rough estimate: if each episode requires Morgan to nap or otherwise recover for at least thirty minutes, and she suffers at least three such attacks on a daily basis, then at least ninety minutes of each day is lost to her impairment. Ninety minutes represents just over twenty percent of an eight hour workday. Given that the vocational expert identified several thousand jobs available to someone of Morgan's age, education, and work experience if she were off task five percent of the time, but no jobs if she were off task twenty percent of the time, (R. 67), the frequency of the episodes is critical to determining her RFC.

The ALJ need not discuss every piece of evidence in the record, but the analysis must offer at least a minimal articulation of the reasoning behind the decision in order to allow meaningful review. *See Boiles*, 395 F.3d at 425; *Zurawski*, 245 F.3d at 889. In a similar case, the Seventh Circuit found that an "ALJ was obligated to solicit more evidence if he believed that the frequency of the seizures, as reflected in the record, was unclear." *Boiles v. Barnhart*, 395 F.3d 421, 426 (7th Cir. 2005). Here, the ALJ gave no indication of why the third party reports were not reliable; indeed, they received no mention whatsoever. The record contains no evidence of the frequency of Morgan's cataplectic episodes except for the statements

rejected or ignored by the ALJ, and yet the ALJ made no attempt to determine the correct frequency, which is central to the RFC. The ALJ, and by extension the Appeals Council, therefore erred in failing to consider the third party reports relating to the frequency of Morgan's cataplectic episodes, as required under the SSA rules. 20 C.F.R § 404.1529(c)(3), and in failing to make an alternative finding as to the frequency, which leaves the decision devoid of a "logical bridge" between the evidence and the denial of benefits. *See Clifford*, 227 F.3d at 872. These errors must be remedied upon remand.

To the extent the ALJ's conclusions rested on Morgan's failure to take her medications, this also reflects an error that must be remedied upon remand. An "inability to pay for medication . . . may excuse failure to pursue treatment." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (*citing* SSR 96-7p at *8). The ALJ observed that "there is no evidence that claimant experiences narcolepsy with cataplexy despite taking appropriate medications," (R. 26), and while we need not delve into the accuracy of that assertion, the Court notes that Morgan's inability to pay—based on the IDPA no longer covering certain prescriptions, (R. 29, 56-57, 280)—is a legitimate reason for noncompliance with the recommended treatment and should not be relied on to deny benefits.

### B. <u>Credibility</u>

Morgan claims that the Appeals Council and ALJ erred in finding that her claims of impairment were not credible. An ALJ's credibility determination receives substantial deference on review unless it is patently wrong and not supported by

16

the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). The ALJ must give specific reasons for discrediting a claimant's testimony, however, and the reasons must find support in the record and be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887-88.

The ALJ's credibility determination found that Morgan's impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 28.) This boilerplate credibility template has been criticized by the Seventh Circuit as failing to indicate "in a meaningful, reviewable way . . . the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). More troubling still is that the template "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Id.* at 645. Such an inverted approach violates the rule that a claimant's statements about the intensity and persistence of pain or other symptoms cannot be disregarded solely because they are not substantiated by objective medical evidence. *Id.* at 646 (*citing* SSR 96-7p). The claimant's credibility must be factored into the RFC determination, not result from it.

17

The ALJ's reasons for finding Morgan not credible in this case are based on a comparison of the claimant's description of her activities of daily living, the medical record, and the ALJ's observations of the claimant at her administrative hearing. When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[1] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id*. at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id*. at *5. In this case, the ALJ noted that Morgan "stayed awake and did not have any concentration problems" at her hearing. (R. 30.) This appears to contrast with Morgan's statement in her application that she cannot sit still for long periods without falling asleep, and it reflects directly on the impairment for which she claims disability. On the other hand, the ALJ's observations consist of two sentences totaling twenty two words. Further, a single administrative hearing may not be long enough to make a thoughtful appraisal of the claimant's ability to concentrate. In other words, the Court is not convinced by the ALJ's abbreviated discussion. Given the high deference accorded to the ALJ's

---

[1] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

credibility determination, however, this direct observation is a satisfactory (if unconvincing) reason for finding the claimant less credible. *See Jens,* 347 F.3d at 213.

The ALJ's credibility finding is not without significant flaws. The ALJ appears to rely in part on Morgan's failure to take medication as evidence that her impairments are not as significant as she alleges. (R. 29-30.) But the ALJ acknowledges, (R. 29), and Morgan emphasizes, (R. 56-57, 280), that IDPA no longer covers certain of her medications and thus she cannot afford them. As discussed above, a claimant's inability to pay for medication is a valid explanation for the failure to pursue treatment. SSR 96-7p; *Myles*, 582 F.3d at 677. This error alone does not require remand, though. Despite the problematic use of boilerplate recitations, references to unaffordable medications, and a cursory overall explanation, the ALJ gave at least one specific and satisfactory reason for discrediting the claimant—her direct observation at the hearing—and this demands the Court's deference.

### C. <u>Obesity</u>

Morgan claims that the Appeals Council and ALJ failed to properly consider her obesity. The thrust of the argument is that the ALJ's mention of Morgan's "slight obesity" was not a sufficient discussion and that the effects of obesity can be exacerbated by certain conditions, such as sleep apnea, which would add limitations that should be factored into her RFC. What Morgan fails to explain is how a further discussion of obesity would have changed the ALJ's decision in this case. The

19

obesity is not a primary impairment; rather, the claimant argues that obesity is exacerbated by sleep apnea, which can lead to fatigue, and which may therefore compound the (work-impairing) effects of her narcolepsy. The non-treating physicians made their RFC assessments with knowledge of Morgan's obesity and the ALJ took note of the obesity in making her determination, however, so Morgan cannot and does not argue that the ALJ failed to consider it at all. Morgan simply wants the obesity to carry greater weight in the ALJ's decision, so to speak. But this is not grounds for reversal or remand. The claimant has not demonstrated that any error by the ALJ would have changed the outcome of the case. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Plaintiff Schiniece Morgan's motion for summary judgment [Doc. No. 19] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this order.

**SO ORDERED.**  **ENTERED:**

**DATE:** ___December 4, 2012_____  _____
 **HON. MARIA VALDEZ**
 **United States Magistrate Judge**